HARRIS, J.,
delivered the opinion of the Court.
The indictment contains two counts — the first for an assault with intent to commit a rape, the second for a rape. At the March Term, 1854, an attempt was made to empanel a jury, and the Court, being satisfied that a fair and impartial trial could not he had in the county of Scott, where the indictment was found, changed the venue to the county of Morgan. At the July Term, 1854, the venue was again changed to the county of Fentress, where at the October Term the prisoner was tried and convicted. A new trial was refused, and an appeal in error was prosecuted to this Court. This Court reversed the judgment, on the ground that the proof, as then presented in the record, did not sufficiently identify the prisoner as the person who committed the assault: the proof did not support the verdict. The cause having been remanded, at the June Term, 1855, the venue was again changed to the county of Putnam. At the August Term, 1855, the prisoner was convicted on the first count, but was found “not guilty” on the second count. A new trial was refused, and the sentence of death was pronounced against the prisoner, and he again appealed in error to this Court. The judgment was reversed, on account of the- misconduct of some of the jurors, and the cause was remanded. At the April Term, 1856, the prisoner filed his affidavit, with the affidavits of two of his counsel, averring that, owing to undue excitement and' prejudice, a “fair and impartial” trial could not be had in *600 the county of Putnam: that he was threatened with and was thought to be in danger of a mob, and for these reasons he asked for a change of venue. This application was refused, and the prisoner was again put upon his trial and convicted. This verdict was, however, set aside by the Court, for reasons not disclosed by the record. At the August Term, 1857, he was again convicted on the first count, a new trial was refused, and the judgment of death pronounced against him, to reverse which this appeal in error is prosecuted to this Court.
Erom a bill of exceptions it appears that in making the jury, nine gentlemen were presented each of whom stated that he had formed an opinion: their opinions were formed upon rumor; they yet believed the rumor, and still have an opinion as to the guilt or innocence of the prisoner. The prisoner objected to these jurors, but the Court ruled that they were competent, and had them put to the prisoner. Seven of them were peremptorily challenged, and, his challenges being exhausted, the other two were placed upon the jury. It also appears from the record that several panels had been exhausted before a jury could be procured.
The jury having been sworn, the State introduced as a witness Mirah Looper, who testified that in August, 1858, she was at the house of one Sexton, Mr. and Mrs. Sexton having gone to visit a sick relation. That their three little children and her niece, then about eight or nine years old, were left to stay with her during the night. About dark the children went to bed, and were asleep. She went to bed herself. Some person knocked at the door, went around the house and knocked at the other door, first at one door, then at the other. They then knocked like they *601 were going to knock down the door. She got np, went to the fire and made a light, opened the door, and saw the prisoner sitting on the loom bench under the shed. The moon shone bright on his face. She was acquainted with the prisoner, and knew it was he. He jumped up and ran off through the corn-field. She waked up the children, took the youngest, then about two or three years old, in her arms, and they set out for her brother Joel’s, a distance of about one mile, through a forest, and a very bad road. When about thirty yards outside of the fence, the prisoner jumped from behind a tree near the road, “with rags around his head; the rags fell off as he came at her, and she threw up her hands and felt his head, and knew it was a negro — that it was the prisoner — because she had seen and felt him.” He jerked the child out of her arms, threw it behind a log, seized her by the throat, threw her on her back, got on her, choked her with one hand, and tried to pull up her clothes with the other. The buttons were torn from the back of her dress, and the dress torn in other places. “He then jumped off of her and ran away, and she did not see him any more.” On cross-examination she- said that the nail-prints of the prisoner remained upon her neck for two or three weeks. There were two doors to Sexton’s house, one on the north and the other on the south side; that there was a shelter or shed all along on the north side, and the loom was under the shed, and to her right as she came out at the door. Her bed was in the north-east corner, and the children’s in the south-east, and the chimney in the west end of the house. All this she pointed out upon a diagram that was before her. The door to the north opened back to the right, and as she opened the north door, the *602 defendant jumped off of the loom bench and ran off. She was asked if on a former trial she did not swear that about the time she was “going to sleep” the rapping took place, and that it was the north door they struck like they would knock it down? She said she did not. She was asked if at the same time she did not swear that she opened the north door, and saw the defendant sitting on the loom bench, and the moon shone in his face, and she knew him? She said she did not. She was then asked if she had not sworn on that day — on her present examination— that it was the north door? And she said she had not — “that it was the south door.” She was asked if on her former examination she did not say it was abóut one hundred and thirty yards from the house to the tree where the defendant attacked her? And she said she did not. She was asked if she did not swear that when the prisoner jumped off of her, he jumped over her head? And she said she did not. She was asked if on a former trial she did not swear that the loom was on the north side of the house, and to her right as she opened the door; that prisoner’s face was turned to her, and the moon was shining full .in his face? She said she did not, but swore it was on the south side. She denied that she swore on the former trial that she told her brother Granville that the prisoner had been up there and had hold of her, and that was all she told him. She denied that she had ever sworn that she never told her sister-in-law (Mrs. Looper) about it at all; that her statement on that trial was the same she had now made. She denied that she had ever sworn that she did not tell her mother all that night, but did the next day. She said the buttons torn from her dress were “singular dowered buttons.” The prisoner *603 knew ber well: bad lived on tbe same plantation where sbe was for years; that be bad slept in tbe same room with ber and ber mother after be was grown; bad frequently met him on tbe plantation, and be bad never given ber or ber mother a saucy word; bad never beard him say a smutty word in ber life.
Sbe was then asked if sbe did not have great feeling against tbe prisoner ? Sbe said sbe bad: that sbe wanted him and bis counsel, and all that would take bis part and defend him, bung; that sbe could take him out and bang him herself, and saw his bead off with an old saw, and would do so if they would let ber, and also tbe counsel that defended him. Sbe said that ber niece and Mr. Sexton’s little daughter, who were with ber that night, are both well grown of their age, are smart and very sensible, and are at borne. She admitted that on tbe former trials sbe bad beard tbe lawyers argue that it was impossible for tbe moon to shine in tbe prisoner’s face under tbe shed on tbe north side of tbe bouse. Sbe denied that sbe ever said that when tbe prisoner jumped out from behind tbe tree “be looked like a ghost.”
Granville Looper, tbe next witness, said that when bis sister came to him, ber hair was “ruffled,” dress torn, and some of tbe buttons off. In a day or two he went to tbe place: tbe ground was torn up “ like bulls bad been fightingbe found some tracks near a chestnut tree, with the toes toward the road, which be believed to be the prisoner’s ; be knew tbe prisoner’s shoes :' they were square-toed and half-soled; be did not measure tbe tracks. He denied that be swore on a former trial that Sexton was with him and saw tbe tracks. He admitted that in bis examination on tbe first trial be did not say a word about *604 the tracks. He said he did not look for other tracks in the field because he did not want to.
Mrs. Nelly Looper was next introduced, and testified that she was the mother of Mirah, and that she was about fourteen years old at the time of the occurrence. That in the evening after Mirah had gone to Mr. Sexton’s, the prisoner came to her house hunting a hog, which he found and carried home. Shortly after night she was called by her son; she went to him and found Mirah there, who told her what had taken place. Her dress was torn, and some of the buttons were off. “ The buttons were peculiar: she never had any such before.” There were scratches or finger-prints to be seen for two or three days. The prisoner at the time had a brother in the neighborhood by the name of George, who is now in Kentucky. He was taller, more slender, and brighter - complected than the prisoner. There were no other slaves in the neighborhood for four or five miles. On cross-examination she said she did not swear on the trial of this cause two years ago that one of her sons went home with the prisoner to help him drive the hog, and got back a little after dark. While the prisoner was at the house, there was nothing said about her daughter. The prisoner had slept for some time in the same room with her and her daughter, and she never heard him say a saucy or a smutty word in her life. She was asked if she had not strong feelings against the prisoner ? She said she could cut off his head with a case-knife, and be a week at it.
Mr. Sexton stated that a day or two after the occurrence his children conducted him to the place. He saw considerable sign of scuffle; saw tracks, but did hot examine them particularly; he found five plain white but *605 tons and a pin, and gaye them to Mirah Looper; and if Granville Looper was with him he does not recollect it. Ele also testified to the good character of Nelly and Mirah Looper.
The defence then introduced M. M. Brien, who testified that he was present at the trial of this cause two years ago; that he heard Mirah Looper examined, and well recollects some portions of her testimony. At that time she swore that about the time she was going to sleep she heard somebody knock at the south door, then at the north door; went back and forwards several times, and then rapped at the north door like he would break it down. She opened the north door, and defendant was sitting on the loom bench to her right hand under the shed; that the moon shone full in his face, and he jumped up and ran off. That she made this statement the witness says he is certain. She also said it was about one hundred and thirty yards from the house to the place where she was attacked. He further swears that she did on that occasion say that when he “jumped out from behind the tree he looked like a ghost.” She also swore that when the prisoner let her go he jumped off over her head, and ran and hid himself behind a tree or a log. That she first told her brother Granville that the prisoner had been up there and had hold of her, and that was all she told him. She said she told her mother, but did not tell her all until next day, and that she did not tell her sister-in-law (Mrs. Looper) at all.
Witness also stated that on the same trial Granville Looper swore that Mr. Sexton was with him and saw the same tracks spoken of by himself. Witness Brien further proved that Mrs. Nelly Looper testified on that *606 trial that her son did go with the prisoner the evening the offence is charged to have been committed to help drive the hog, and did not get hack until after dark.
Mr. Colms and Mr. Botts were next examined, and their testimony was substantially the same as that above given by Mr. Brien. The foregoing embraces all the evidence that is at all material in the cause.
Upon this state of the case several questions have been presented for our determination.
It is first insisted for the plaintiff in error that the Court erred in refusing to change the venue on the application of the prisoner at the April Term, 1856, and for this cause the judgment should be reversed.
The second error relied on is that the prisoner was not tried by an “impartial jury,” the jurors having prejudged his case, and for this reason the verdict should be set aside, and a new trial granted.
The third error assigned is that the prisoner was tried upon both counts in the indictment, when he had been previously acquitted on the second count.
And the fourth objection is that the proof does not support the verdict.
We will dispose of these questions in the order in which they are presented.
Then as to the application for a change of venue, it is certainly the imperative duty of the Court to see, as far as it is practicable, that the accused shall have a fair trial by an “impartial jury.”
This right, so essential to the preservation of the life and liberty of the accused, is secured by the constitution of our own State, and cannot be disregarded by the Courts. We think it is clear that by the provisions of *607 the 1st section of the act of 1855-6, ch. 112, (Pamph. Acts,) the accused in all felony cases has the right, by the affidavits of disinterested persons, to show that from “undue excitement” against him, or any other cause, “a fair trial could not probably be had” in the county -where the prosecution is pending; and the Court, in the exercise of a sound legal discretion, being satisfied of such fact, would be bound by the fundamental law to remove the trial of the cause to any adjoining county where the same causes do not exist. But if we were even satisfied that the Court had improperly exercised its discretion, we do not think that the question is so presented in this case as to make it available. This application for a change of venue was made and refused at the April Term, 1856. The prisoner was then tried and convicted, and a new trial granted; but at the August Term, 1857, at which the present conviction was had, no such application was made. We think, however, that it might not be improper to suggest that from the great difficulty in procuring the jury, as is shown by the record, the Circuit Judge would have been well warranted in ordering a change of venue from his own observation at that term. But his omitting to do so certainly furnishes no ground for reversing the judgment.
The next question arises upon the competency of the nine jurors who were put to the prisoner as competent. Each of them stated that he had formed an opinion as to the guilt or innocence of the prisoner; that the opinion was formed from rumor; that they yet believe the rumor; and each one said he still had an opinion. Questions of this character have been so often before *608 this Court, that it was thought they had been settled in almost every aspect in which they could he presented. It is now well settled in this State by numerous adjudications that an opinion formed upon mere rumor, though entertained at the time the juror is presented, does not disqualify him.
The third error assigned is that the prisoner was tried upon both counts in the indictment, when he had been previously acquitted on the second count. There is no error in this. The jury were expressly instructed that no conviction was sought upon the second count, and their verdict is that they find the defendant guilty of “an assault with intent to commit a rape upon Mirah Looper, in manner and form as charged in the indictment.”
The first count is the only count in the indictment that charges him with an assault with intent to commit a rape; therefore this is clearly a finding upon the first count, and upon that count he never had been acquitted. The case of Campbell vs. The State, (9 Yerg. Rep., 333,) relied on by the plaintiff in error, is wholly different from the case before the Court. In that case the defendant was convicted on a count upon which he had previously been acquitted, and for that reason the judgment was properly arrested. We have seen, however, that such is not this case.
This brings us to the consideration of the sufficiency of the proof to support the verdict. This case was before this Court three years ago, and is reported in the second volume of Sneed’s Reports, page 15. In that opinion the Court say, “The identity of the prisoner with the person who committed the assault, is a point on which, *609 as it seems to us, more full and satisfactory proof may be adduced. We are not content to affirm the conviction-in the present state of the case.”
In examining the proof in this record, there are many circumstances which will’ strike the candid, unprejudiced mind with some force as being somewhat incompatible with our views and impressions of human nature and human action, and well calculated to excite doubt and distrust of the accuracy of the statements made by the main witness for the prosecution. She was at the house of Mr. Sexton without, so far as is shown by the proof, any means of protection. She was in bed, and the four children, the only persons she had with her, were asleep- in another bed. Some person knocks, first at one door and then at the other, and this is repeated several times. They then knock as if they would break the door down, and she gets up without waking the children, the eldest of whom was eight or nine years old, and, without ever demanding to know who it was, she deliberately opens that door which had proved itself sufficient to resist these hard knocks, and which was her only reliable means of protection. Is it not passing strange that under these circumstances she did not wake up the children ? Is it not probable, when we appeal to our knowledge of human nature and human experience, that that would have been the first idea that would have occurred to a young and frightened female ? Is it not equally strange that she did not demand to know who it was that knocked ? And is it not unaccountable, if she was really alarmed, that she would open the door at all ? But this is not all that is strange in this •proof. Was it not strange that when she opened the door and saw the prisoner, whom she had known and lived *610 with on the same plantation for years, who had “often slept in the same room with her and her mother,” and whom she had frequently met on the plantation, and had “ never heard utter a saucy or a smutty word in her life,” she did not speak to him ? If she had been alarmed, there is nothing more natural than that her first impulse would have been to wake the children, and then, if possible, make the doors more secure; but if she was not alarmed, as we think her conduct indicates, when she opened the door and saw the prisoner, whom she had known so long, and had never known to misbehave, would it not have been most natural that she would have spoken to him ? Is it not also strange, if the prisoner had gone there for the purpose of perpetrating the offence with which he is charged, that when she had opened the door and placed herself completely in his power, the children all asleep and no one to see or hear what might take place, that he made no advances, never uttered a word, but broke and fled with precipitation?
And to us it seems a little strange that after he had had her so completely in his power, and had fled, that she should then have thought it necessary to wake up the children, and set out over a bad road, through a forest, and carry a child in her arms, two or three years old, a distance of one mile, for purposes of protection. But is it not equally strange that the prisoner would have let this favorable opportunity pass, and then place himself in ambush on the wayside to attack her as she passed ? How did he know or what right had he to suppose that a young and timid female would undertake what under the circumstances she might have regarded as a perilous enterprise ? Were we, however, to assume that he supposed *611 she -would leave, lie must have known that she would have the children with her, the eldest being eight or nine years old. Is it probable, then, that he would have let the first opportunity slip, when the children were all asleep, with the view of making the attack in the presence of a girl eight or nine years • old and three other children 1 Another strange thing is why these two little girls, the eldest now about thirteen years of age, and shown in the proof to be “well grown and very smart and sensible,” have not been introduced. All these circumstances, to say the least of them, are well calculated to excite doubts in an unprejudiced mind, which in a capital case should exert a controlling influence.
So this Court thought when the case was before them on a former occasion. Besides the testimony of this witness, there are but slight circumstances to identify the prisoner as the person who made the assault. Her mother proves that the prisoner was at her house on the evening preceding the night on which the offence is charged to have been committed, hunting a hog, but said nothing about her daughter. This testimony of her mother was before this Court on the former trial, when the proof was held to be insufficient to support the verdict. But if the proof was then deemed insufficient, how much less is it to be relied on in the present record! Then, none of the material witnesses for the prosecution stood contradicted; now, they stand contradicted, and that, toó, under circumstances well calculated to excite distrust. The main witness is not only contradicted by three credible witnesses, but she flatly contradicts herself, and firmly persists in it. With a diagram of Mr. Sexton’s house before her, which from her examination she shows she well *612 understood, sbe tells the jury that on the north side of the house there was a shed all along, and that it was under that shed the prisoner was sitting when she opened the door and saw him, and the moon was shining full in his face. But in the course of her examination, she seems to have recollected that it had been argued on a former trial that the moon could not have shone in his face in the position she placed him on the north side of the house; and she suddenly tacks and declares that it was on the south side. She was asked if she had not sworn on the former trial that it was the north side. She said she had not. She was asked if she had not sworn on her present examination that it was the north side. She said she had not. Now it is positively sworn by three other witnesses that she did state on the former trial that it was on the north side of the house she saw the prisoner sitting under the shed. And if she had not so sworn on that occasion, why was it argued, as she admits it was, that it was impossible for the moon to shine in his face in the position she placed him on the north side of the house ? She is also palpably contradicted by these witnesses, as is shown by the record, in many other particulars less material, and which we deem unnecessary to notice. One of the main circumstances relied on to corroborate the statement of this witness as to the identity of the prisoner is that given by her mother, that the prisoner was at her house on the evening preceding the night on which the offence is charged to have been committed. But whatever this circumstance may have been worth, it seems to us that its force is very much broken. She was asked if she did not swear on a former trial that one of her sons went home with the prisoner that *613 evening to assist Mm in driving a hog, and did not return until after dark; and she denied that she had so sworn But the fact that she did so swear is clearly established by three witnesses.
The only remaining circumstance relied on to identify the prisoner as the guilty agent is the tracks seen and described by Granville Looper. But he stands in the same category with his mother and sister. He was asked if he had not stated on a former trial that Mr. Sexton was with him and saw the tracks also; and he said that he had not so stated. But the proof now clearly shows that he did make the statement; and what also looks a little suspicious is that he admits that on the first trial he wholly omitted to say any thing about these tracks, to which so much importance is now attached. The question is, should a verdict, involving capital punishment, be permitted to stand upon such testimony? We think not. It seems to us that a jury free from prejudice and excitement would not be likely, upon the state of the facts before us, to arrive at the conclusion of the guilt of the prisoner. This case strongly admonishes us of the necessity of a watchful vigilance and an unyielding firmness on the part of judicial officers to see that the invaluable right of a fair trial by an “impartial jury” should not be disregarded. And where such jury cannot be procured, on account of undue excitement, in the county where the prosecution is pending, the Court should change the venue to some other county free from such objection.
This provision, securing to the accused the right of trial by an “ impartial jury,” is not unmeaning — was not *614 placed in our bill of rights without motive, and cannot be disregarded by the Courts.
The judgment must be reversed, and the cause remanded for another trial.